IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

ROBERT N. COGAR,

        Plaintiff,

        v.                       Civil Action No. 3:05-CV-119

JO ANNE B. BARNHART,
COMMISSIONER OF
SOCIAL SECURITY,

        Defendant.


## REPORT AND RECOMMENDATION
## SOCIAL SECURITY


## I.  Introduction

A.    Background

    Plaintiff, Robert N. Cogar, (Claimant), filed his Complaint on November 8, 2005,

seeking Judicial review pursuant to 42 U.S.C. § 405(g) of an adverse decision by Defendant,

Commissioner of Social Security, (Commissioner).[1]  Commissioner filed her Answer on April

10, 2006.[2]  Claimant filed his Motion for Summary Judgment on May 10, 2006.[3]  Commissioner

filed her Motion for Summary Judgment on June 9, 2006.[4]  Claimant filed a Response on June

22, 2006.

B.    The Pleadings

_____

[1] Docket No. 1.

[2] Docket No. 7.

[3] Docket No. 10.

[4] Docket No. 16.

1. Claimant's Motion for Summary Judgment.

2. Commissioner's Motion for Summary Judgment.

C.    Recommendation

I recommend that:

1.    Claimant's Motion for Summary Judgment be GRANTED and Commissioner be directed to issue an award of benefits to Claimant since Claimant meets the disability requirements of listing 12.05C.

2.    Commissioner's Motion for Summary Judgment be DENIED for the same reasons set forth above.

## II.  Facts

A.    Procedural History

Claimant filed his application for Supplemental Security Income (SSI) on April 12, 2002, alleging disability since June 28, 1992.[5]  The application was denied and initially and on reconsideration.  Claimant requested review by an ALJ and received a hearing before an ALJ on June 24, 2004.  The ALJ ruled against Claimant on December 10, 2004.  Claimant filed a request for review from the Appeals Council, in which he submitted additional evidence.  The Appeals Council denied the request on September 23, 2005.  The Appeals Council did not note the additional evidence submitted in this denial.  On December 30, 2005, the Appeals Council set aside the September 23 denial and issued a new ruling, again denying the application for review.

---

[5] The ALJ noted Claimant is not eligible to receive SSI benefits for any period before the month of his application and therefore only considered whether Claimant was disabled since April 1, 2002.  (Tr. 20).

The Appeals Council noted the new evidence in this ruling. This action was filed and proceeded as set forth above.

B.     Personal History

Claimant was 49 years old on the date of the June 24, 2004 hearing before the ALJ.

Claimant has a limited education. Claimant has no prior relevant work experience.

C.     Medical History

The following medical history is relevant to the time period during which the ALJ concluded that Claimant was not under a disability: April 1, 2002 – December 10, 2004.

**Morgan D. Morgan, M.A., 7/22/02, Tr. 175**
WAIS III
   Verbal IQ: 66
   Performance IQ: 76
   Full scale IQ: 68
   Verbal comprehension : 68
   Perceptual organization: 80

These scores do not appear to be valid. The person lacked motivation.

WRAT 3
   Reading: <45, 1st grade level
   Spelling: 46, 1st grade level
   Arithmetic: 45, 1st grade level

These scores are only a rough estimate of the person's intellectual functioning. Motivation was lacking during testing.

Diagnostic impression:
   Axis I: adjustment disorder, with depressed moot, alcohol dependence, with physiological dependence, early partial remission
   Axis II: diagnosis deferred for personality disorder, borderline intellectual functioning (provisional)

Prognosis: poor

**Mental Residual Functional Capacity Assessment, 8/7/02, Tr. 184**
Understanding and memory:

The ability to remember locations and work-like procedures and the ability to understand and remember detailed instructions: not significantly limited

The ability to understand and remember very short and simple instructions: no evidence of limitation

Sustained concentration and persistence:

The ability to carry out detailed instructions, the ability to maintain attention and concentration for extended periods, the ability to perform activities within a schedule, maintain regular attendance, and be punctual with customary tolerances, the ability to complete a normal work day and work week without interruptions and psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods: not significantly limited

The ability to work in coordination with or proximity to others without being distracted by them: moderately limited

The ability to carry out very short and simple instructions, the ability to sustain an ordinary routine without special supervision, the ability to make simple work-related decisions: no evidence of limitation

Social interaction

The ability to interact appropriately with the general public, the ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness: not significantly limited

The ability to accept instructions and respond appropriately to criticism from supervisors, the ability to get along with co-workers or peers without distracting them or exhibiting behavioral extremes: moderately limited

The ability to ask simple questions or request assistance: no evidence of limitation

Adaptation

The ability to respond appropriately to changes in the work setting, the ability to set realistic goals or make plans independently of others: not significantly limited

The ability to be aware of normal hazards and take appropriate precautions, the ability to travel in unfamiliar places or use public transportation: no evidence of limitation

**Psychiatric Review Technique, 4/12/02, Tr. 189**

Functional limitation

Restriction of activities of daily living, difficulties in maintaining concentration, persistence, or pace: mild

Difficulties in maintaining social functioning: moderate

**B. D. Orvik, 3/14/03, Tr. 231**

Diagnosis: acute alcoholic intoxication, chronic alcoholism, ateriosclerotic heart disease with history of previous myocardial infarction

**B. D. Orvik, 4/10/01, Tr. 273**

Impression: mild posterior disc bulge at the L5-S1 levels.

**Physical Residual Functional Capacity Assessment, 8/22/03, Tr. 277**
Exertional limitations
       Occasionally lift and/or carry 50 pounds
       Frequently lift and/or carry 25 pounds
       Stand and/or walk about 6 hours in an 8 hour work day
       Sit for a total of about 6 hours in an 8 hour work day
       Push and/or pull: unlimited

Postural limitations: none established
Manipulative limitations: none established
Visual limitations: none established
Communicative limitations: none established
Environmental limitations: none established

**Brenda Hinkle, M.A., 10/30/03, Tr. 287**
WAIS III
       Verbal IQ: 66
       Performance IQ: 74
       Full scale IQ: 66

WRAT III
       Reading: <45, 1st grade level
       Spelling: <45, 1st grade level
       Arithmetic: <45, 1st grade level

The evaluations are considered valid.

DSM-IV Diagnoses:
       Axis I: adjustment disorder, alcohol dependence, with physiological dependence, in full remission
       Axis II: mild mental retardation
       Axis III: low back and right hip pain, right hand numbness, an irregular heartbeat, colon difficulties, two previous heart attacks

**Psychiatric Review Technique, 10/30/03, Tr. 293**
The patient has significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period, i.e., the evidence demonstrates or supports onset of the impairment before age 22, with one of the following: a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.

Functional limitation

Difficulties in maintaining social functioning: mild
Restriction of activities of daily living: moderate
Difficulties in maintaining concentration, persistence, or pace: marked
Repeated episodes of decompensation, each of extended duration: insufficient evidence

**Medical Assessment of Ability to Do Work-Related Activities (Mental), 10/30/03, Tr. 307**
Making occupational adjustments
    Relate to co-workers, deal with the public, interact with supervisors: fair
    Follow work rules, use judgment, deal with work stresses, function independently,
maintain attention/concentration: poor

Making performance adjustments
    Understand, remember and carry out complex job instructions, understand, remember and
carry out detailed, but not complex job instructions, understand, remember and carry out simple
job instructions: poor

Making personal-social adjustments
    Making personal appearance, behave in an emotionally stable manner, relate predictably
in social situations: good
    Demonstrates reliability: fair

**B. D. Orvik, M.D., 4/19/04-4/23/04, Tr. 310**
Provisional Diagnosis: chest pain in a patient with previous coronary artery disease, possible
seizure disorder, history of alcohol abuse
Final diagnosis: chest pain consistent with possible angina pectoris, coronary artery disease,
history of alcohol abuse

**A. Sabbagh, M.D., 4/23/04, Tr. 313**
Assessment: chest pain, prolonged QT interval which is improved, history of alcohol intake

**Y. Abdulnabi, M.D., 4/21/04, Tr. 314**
Diagnosis: atypical chest pain, prolonged QT interval, history of alcohol abuse

**B. D. Orvik, 4/19/04, Tr. 317**
Diagnosis: chest pain in a patient with previous coronary artery disease, possible seizure
disorder, history of alcohol abuse

**A. Sabbagh, M.D., 4/19/04, Tr. 324**
Impression: decreased activity in the inferior wall most likely secondary to diaphragmatic
artifact or previous myocardial infarction, very small area of possible reversible defect in the
apex, small are of ischemia cannot be ruled out

**B. D. Orvik, 4/19/04, Tr. 325**
Conclusion: left ventricle systolic dysfunction with ejection fraction of 25-30 percent, mild

mitral regurgitation and tricuspid regurgitation

D.      Testimonial Evidence

Testimony was taken at the June 24, 2004 hearing.  The following portions of the
testimony are relevant to the disposition of the case.

[EXAMINATION OF CLAIMANT BY HIS ATTORNEY]

Q       Do you have any problems reading and writing?

A       Yes, I do.

Q       Okay.  Can you tell me a little bit - - do you ever look at the newspaper?

A       I try to.

Q       Do you have any problems reading the newspaper?

A       Yes, I do.

Q       What about the letters that come to you from Social Security about your
disabililty claim?

A       I have other people read them to me.

ALJ        Can you speak up a little bit, sir?  I've got this thing in my ear here.

CLMT       Oh, I have other people read them to me.

BY ATTORNEY:

Q       Okay.  Do you have a driver's license?

A       No.

Q       Did you ever take the test for a driver's license?

A       Yes.

Q       What happened?

A       I passed.

Q       Okay.  Did you ever have a driver's license?

A       Yes, sir, I have.

Q       What kind of test did you take?

A       Oral.

Q       They read it to you?

A       Um-hum.

Q       Did you have to - - did you take it one time?

A       Yes, sir.

Q       Okay.  Now, you said you don't have a driver's license now.  Is that because you had some DUIs?

A       Yes.

                          *                    *                    *

Q       Your girlfriend.  How long have you and Cheryl been together?

A       About 10 years.

Q       Okay.   When you get the mail, who reads the mail?

A       She does.

Q       Okay.  Do you ever cook?

A       Yeah.

Q       Do you ever use a recipe to cook?

A       No.

Q       Okay.  Now, let me ask you about your work.  Have you worked in the last 15

years?

A    15 years?  Not as I know of.

Q    Okay.  Do you remember when the last time you worked was?

A    No sir, I don't.

Q    Was it back in the early '90s, late '80s, somewhere back in there?

A    Yeah, I worked for H.E. Acker [phonetic] Well Services.

Q    What kind of work did you do for them?

A    Heavy lifting and truck driving and welding and dozer operator.

Q    Have you done some welding in the past?

A    [no audible response.]

ALJ    Say yes, answer verbally.

CLMT    Yes.

BY ATTORNEY:

Q    Have you run some equipment in the past?

A    Yes.

Q    Okay.  Where did you learn to do that?

A    On the job.

Q    Did somebody show you?

A    Um-hum.

Q    Okay.  Now, Mr. Cogar, do you have problems with your back?

A    Yes, sir.

Q    Can you tell me about that?

A        I guess I got a pinched nerve.

Q        Does it hurt?

A        Yes, sir.

Q        Can you tell me - - describe that to me?

A        It starts hurting through my spine, sends tingles down my legs and sometimes I can't get up.

Q        How often does that happen?

A        If I walk very much, a lot.

Q        Okay.  What do you do to try to relieve that pain?

A        Lay on the couch a certain way.

                        *                *                *

Q        Okay.  Does laying down on the couch help?

A        Yes, sir.

Q        How often do you do that, lay down?

A        If I walk through the house or be in the bathroom very much, then when I come back through.

Q        Do you lay down every day?

A        Yes, sir.

Q        Do you - - on a daily basis, how much time are you spending laying down, do you think, say from 8:00 to 5:00 in the afternoon?

A        I'm not sure.

Q        About how much of that time?

A      A couple hours, I'd say.

Q      Okay.  You mentioned if you walk, how does that affect your back?

A      It pinches something back there, I don't know.

Q      Does it make it hurt worse?

A      Um-hum.

Q      What if you stand?

A      If I stand very long it does the same thing.

Q      What if you sit in one position?

A      Like riding, yes.

Q      Okay.  How did you get up here today?

A      Rode.  A friend of ours brought us.

Q      Okay.  And did you come from [INAUDIBLE]?

A      We came from Weston.

Q      Weston, all right.  And that's down - - that's about 60 miles away.  How long did it take you to get here?

A      An hour.

Q      Did you sit that whole time?

A      Yes, sir - - well, we stopped twice.

Q      Okay.  How does your back feel after that trip?

A      Hurting.

Q      Now, you've also had some problems with chest pain?  Can you tell me about that?

A       I had a couple of heart attacks and I'm on  nitro.

                        *               *               *

Q       What kind of things around the house might you try to do?

A       Like run the vacuum cleaner.

                        *               *               *

Q       Just the two of you?  Now, Mr. Cogar, do you have any problems remembering

things - -

A       Yes, I do.

Q       - - or concentrating on things?  Any problem with that?

A       Yes, sir.

Q       Can you tell me about that?

A       Well, when I was little I had seizures and they said I had a couple here recently.

It just makes everything slower.  I can't remember.

Q       Do you ever - - does your girlfriend ever tell you to do something and you forget

to do it?

A       Yes.

Q       Do you ever start something and not finish it?

A       I haven't done that.

Q       Do you watch TV?

A       Yes.

Q       What kind of shows do you watch on TV?

A       Westerns.

Q    Do you ever have any problems following the whole - - through the whole thing?

A    If I get up and go to the bathroom.

Q    Okay.  Now, you mentioned at some time in the past you had problems with your hands going numb.  Can you tell me about that?

A    They just get numb and I drop things.

                    *                *                *

[EXAMINATION OF CLAIMANT BY ALJ]

Q    Sir, I'd like to get a little bit more information about that last work that you did. You said you worked for a company?

                    *                *                *

Q    And what exactly did you do?

A    Everything.  I done about everything.

Q    Everything includes - - you did welding?

A    Yes, sir.

Q    What kind of welding, arc welding or - -

A    Um-hum, arc welding.

Q    And what would you be welding?  What needed to be welded?

A    Well, we put patches in 100 barrel tanks.

Q    And what, you drove truck also?

A    Um-hum.   Yes, sir.

Q    A lot of lifting?

A    Lots of lifting.

Q        100 pounds?

A        More than that.

Q        More than that, okay.

A        All the weld tools are heavy.

Q        So besides welding, just general labor and truck driving, did that job have any other kind of duties besides those things?

A        No, sir.

Q        That's about it?  All right.  And that's the last time you worked?

A        Yes, sir.

Q        And you think that was maybe the early '90s or late '80s?

A        That's right - -

*                    *                    *

[EXAMINATION OF VOCATIONAL EXPERT BY ALJ]

A        Yes, we'll start with the welding job.  The arc welding, as he performed it and as it is also done in the national economy, is heavy, semiskilled work.  He also mentioned he operated a bulldozer, which is heavy, semiskilled.  He was a truck driver involving significant lifting of welding equipment, that would be heavy to very heavy, semiskilled.  And general laborer or roustabout in the gas and petroleum industry is classified also as heavy, semiskilled.

ALJ            Is there any comments or observation you can make about the kind of IQ you have to have to do arc welding?  Would a person with an IQ in the 60s be typically able - - expected to be able to do that kind of work?

ATTY            Your Honor, I would have to object for the record to this question because

Mr. Mahler is a vocational expert, he's not a psychologist.

ALJ          He deals in IQ scores, I'm sure, from time to time.  Your objection is noted.

VE          Typically just - - and I understand what you're saying.  In comparing IQ scores as I have over the years in matching people for jobs, I would say that an IQ of 66 would not be comparable to somebody who would be able to do arc welding or semiskilled work.

BY ADMINISTRATIVE LAW JUDGE:

Q          All right.  Then let me ask you to assume a hypothetical individual of the Claimant's age, educational background, and work history who would be able to perform a range of light work.  Would require a sit/stand option; could perform postural movements occasionally, except could not climb ladders, ropes or scaffolds; would be limited to unskilled work involving routine and repetitive instructions and tasks.  Would there be any work in the regional or national economy that such a person could perform?

A          Yes, Your Honor, there are jobs that would match those limitations.  Some examples at the light level I could offer would be a laundry folder.  There are 300 in the local labor market, 48,000 nation.   There are also hand packers at the light level, 600 local, 200,000 nation.  There are sorters and graders, 200 local, 49,000 nation.  And there are simple assembly jobs, Your Honor, small products, 1,500 local, 464,000 nation.  These are all light jobs with a sit/stand option and no climbing.

Q          Is anything in your testimony inconsistent with anything contained in the DOT?

A          The only inconsistency is that the sit/stand option is not mentioned or described in the DOT definitions.  The reason I offer these jobs in response to your hypothetical is based on

my experience in placing disabled workers for the last 25 years. I have found that dealing with employers at these types of jobs typically permit the worker to sit or stand while doing essential duties.

*  *  *

[EXAMINATION OF VOCATIONAL EXPERT BY CLAIMANT'S ATTORNEY]

Q Mr. Mahler, based on your experience I'm assuming is what you're testifying from, have you experienced a situation where someone with IQ in the 60 to 70 range would start this type of job as a laborer? Have you seen that happen?

A I'm sure, yes.

Q Is it common for someone in a laborer position to be shown on the job, for instance, how to use a welder or how to drive a truck or - -

A It could occur, yes. It's not an uncommon occurrence for a laborer to be given other duties that go along with the job.

Q Now, is there any indication in the file about how well Mr. Cogar did as a welder?

A No, I didn't see anything. I just - - file review just gave the job titles and dates, approximate dates and times.

Q There's no indication actually that he was a very good welder?

A No, there's not.

Q Or that he was a good equipment operator?

A No.

Q Okay. Now, would it be possible for someone to have an IQ score in the 60's attempt to weld and not do very well at it?

16

A        Sure.

                            *               *               *

ATTY        Mr. Mahler, if in addition to the limitations imposed in Judge Alexander's
first hypothetical, if you had a person that had deficiencies with the following work rules, that
ability was poor, and I'll define that.  That ability was poor, defined as ability to function in this
area is seriously limited but not precluded; judgment was poor; dealing with work stresses was
poor; function independently was poor;  maintain attention, concentration was poor; demonstrate
reliability was poor - - I'm sorry, fair; interacting with supervisors was fair; dealing with public
was fair; relate to coworkers was fair - -

                            *               *               *

VE        Yes, it would.  These jobs are all competitive employment, which assumes
the ability to function independently within a work schedule, follow work processes and rules,
and basically not have any additional help.  If the person's pace was not up to the other workers
or he couldn't finish tasks within the time allotted by the employer after they show a person how
to do a job, even though they're simple and routine, if this person could not maintain his
persistence pace and concentration, he would not be able to do these jobs adequately.

                            *               *               *

E.        Lifestyle Evidence

        The following evidence concerning the Claimant's lifestyle was obtained at the hearing
and through medical records.  The information is included in the report to demonstrate how the
Claimant's alleged impairments affect his daily life.

•        Plays the guitar occasionally (Tr. 112)

- Watches television three to four hours per day (Tr. 126)

- Listens to the radio one to two hours per day (Tr. 126)

- Alcohol dependence (Tr. 179)

- Maintains his own personal hygiene (Tr. 180)

- Smokes one pack of cigarettes per day (Tr. 287)

- Washes dishes, sweeps the floor, vacuums, and dusts (Tr. 288)

- Fixes coffee (Tr. 345)

- Goes to the store for groceries (Tr. 346)

- Lives with his girlfriend (Tr. 368)


## III.  The Motions for Summary Judgment

A.    <u>Contentions of the Parties</u>

Claimant contends that the ALJ's decision is not supported by substantial evidence.  He raises three arguments for the Court to consider.  First, Claimant argues the ALJ erred in finding him not under a disability under listing 12.05C.  Second, he contends the ALJ erred in attributing much of the cause of his mental impairments to his history of alcoholism.  Finally, Claimant argues the ALJ erred in finding he exaggerated his symptoms.

Commissioner maintains that the ALJ's decision was supported by substantial evidence.  Commissioner maintains the ALJ properly determined Claimant did not meet the requirements for disability under 12.05C.  Commissioner also argues the ALJ properly considered the impact of Claimant's alcoholism on his disability.  Finally, Commissioner contends the ALJ made correct determinations regarding Claimant's credibility.

B.    The Standards.

1.    Summary Judgment.  Summary judgment is appropriate if  "the pleadings,

depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,

show there is no genuine issue as to material fact and the moving party is entitled to judgment as

a matter of law."  Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears the initial

burden of showing the absence of any issues of material fact.  Celotex Corp. v. Catrett, 477 U.S.

317, 322-23 (1986).  All inferences must be viewed in the light most favorable to the party

opposing the motion.  Matsushita Elec.  Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587

(1986).  However, "a party opposing a properly supported motion for summary judgment may

not rest upon mere allegations or denials of [the] pleading, but...must set forth specific facts

showing that there is a genuine issue for trial."  Anderson v.  Liberty Lobby, Inc., 477 U.S. 242,

256 (1986).

2.    Judicial Review.  Only a final determination of the Commissioner may receive

judicial review.  See, 42 U.S.C. §405(g), (h); Adams v. Heckler, 799 F.2d 131,133 (4th Cir.

1986).

3.    Social Security - Medically Determinable Impairment - Burden. Claimant bears

the burden of showing that she has a medically determinable impairment that is so severe that it

prevents her from engaging in any substantial gainful activity that exists in the national

economy.  42 U.S.C. § 423(d)(1), (d)(2)(A); Heckler v. Campbell, 461 U.S. 458, 460 (1983).

4.    Social Security - Medically Determinable Impairment.  The Social Security Act

requires that an impairment, physical or mental, be demonstrated by medically acceptable

clinical or laboratory diagnostic techniques.  42 U.S.C. § 423(d)(1), (3); Throckmorton v. U.S.

Dep't of Health and Human Servs., 932 F.2d 295, 297 n.1 (4th Cir. 1990); 20 C.F.R. §§ 404.1508, 416.908.

5.    Disability Prior to Expiration of Insured Status- Burden.  In order to receive disability insurance benefits, an applicant must establish that she was disabled before the expiration of her insured status.  Highland v. Apfel, 149 F.3d 873, 876 (8th Cir. 1998) (citing 42 U.S.C. §§ 416(i), 423(c); Stephens v. Shalala, 46 F.3d 37, 39 (8th Cir.1995)).

6.    Social Security - Standard of Review.  It is the duty of the ALJ, not the courts, to make findings of fact and to resolve conflicts in the evidence.  The scope of review is limited to determining whether the findings of the Secretary are supported by substantial evidence and whether the correct law was applied, not to substitute the court's judgment for that of the Secretary.  Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

7.    Social Security - Scope of Review - Weight Given to Relevant Evidence.  The Court must address whether the ALJ has analyzed all of the relevant evidence and sufficiently explained his rationale in crediting certain evidence in conducting the "substantial evidence inquiry."  Milburn Colliery Co. v. Hicks, 138 F.3d 524, 528 (4th Cir. 1998). The Court cannot determine if findings are unsupported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence.  Gordon v. Schweiker, 725 F.2d 231, 235-36 (4th Cir. 1984).

8.    Social Security - Substantial Evidence - Defined.  Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  Substantial evidence consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.  Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (citations omitted).

9.     Social Security - Sequential Analysis.  To determine whether Claimant is disabled, the Secretary must follow the sequential analysis in 20 C.F.R. §§ 404.1520, 416.920, and determine: 1) whether claimant is currently employed, 2) whether she has a severe impairment, 3) whether her impairment meets or equals one listed by the Secretary, 4) whether the claimant can perform her past work; and 5) whether the claimant is capable of performing any work in the national economy.  Once claimant satisfies Steps One and Two, she will automatically be found disabled if she suffers from a listed impairment.  If the claimant does not have listed impairments but cannot perform her past work, the burden shifts to the Secretary to show that the claimant can perform some other job.  Rhoderick v. Heckler, 737 F.2d 714-15 (7th Cir. 1984).

C.     Discussion

I.

Disability under § 12.05C

Claimant first argues the ALJ erred in determining he did not qualify for disability under § 12.05C of the medical listings.  The § 12.05C inquiry occurs at the third step of the five step sequential evaluation process Commissioner uses for determining disability, as detailed above. 20 C.F.R. § 416.920; 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.05C; Chunn v. Barnhart, 397 F.3d 667, 671 (8th Cir. 2005).  Section 12.05C concerns mental retardation.  If the Claimant meets its requirements, he "is presumed disabled without further inquiry."  20 C.F.R. § 416.920.

The Regulations provide that to show mental retardation under § 12.05C, the Claimant must demonstrate as follows:

Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the

developmental period, i.e., the evidence demonstrates or supports onset of the impairment before age 22.

The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

. . .

C.  A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.

20 C.F.R. pt. 404, subpt. P, app. 1, § 12.05.  Furthermore, § 12.00A provides the introductory paragraph is more than merely descriptive of the following parts.  20 C.F.R., pt. 404, subpt. P, app. 1, § 12.00A.  This section states that Claimant must satisfy "the diagnostic description in the introductory paragraph and any one of the four sets of criteria."  Id.  Viewed in this light, Claimant must show the presence of four factors to qualify for § 12.05C disability: (1) "significantly subaverage intellectual functioning" before age 22, (2) "deficits in adaptive functioning initially manifested" before age 22, (3) "a valid verbal, performance, or full scale IQ of 60 through 70," and (4) "a physical or other mental impairment imposing an additional and significant work-related limitation of function."  20 C.F.R. pt. 404, subpt. P, app. 1, § 12.05C; Foster v. Halter, 279 F.3d 348, 354-55 (6th Cir. 2001).[6]  Claimant must demonstrate all four parts; portions will not suffice.  20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00A.

The ALJ determined Claimant did not meet the requirements of 12.05C.  The ALJ noted

---

[6] The Eighth and Third Circuits combine the first and second factors into one inquiry that simply speaks of the retardation manifesting itself before age 22.  Maresh v. Barnhart, 438 F.3d 897, 899 (8th Cir. 2006); Markle v. Barnhart, 324 F.3d 182, 187 (3d Cir. 2003).  Nevertheless, the difference only represents a matter of semantics.  See Maresh, 438 F.3d at 900 (speaking of "deficits in adaptive functioning" when examining if retardation had manifested itself before age 22).  Since the four part test employed by the Sixth Circuit most closely parallels the plain language of the regulations, this Court will use that test.

that although Claimant received a full scale IQ score of 68 from Morgan Morgan, M.A., the results were considered invalid because of Claimant's perceived poor effort. (Tr. 23). While the ALJ acknowledged Claimant received substantially the same scores in another test that was considered valid, the ALJ did not credit these results. (Tr. 23, 25). The ALJ noted that although the examiners noted Claimant received significantly higher scores while in grade school, they made no effort to resolve this discrepancy. (Tr. 23, 291). Finally, the ALJ stated Claimant received significantly higher intelligence scores while in grade school. (Tr. 24). The ALJ's findings will be upheld as long as substantial evidence exists to support them. Hays, 907 F.2d at 1456.

The Court concludes substantial evidence is lacking. The ALJ simply misunderstood the significance of Claimant's early childhood IQ tests. When looking at the test results, a person sees under the hearing "Test – Kind or Type" the label "D.I. IQ 89," and immediately below that the same letters, except with "101" substituted. (Tr. 134). The "score" accompanying "D.I. I.Q 89" is 54, and is 70 for the "101" label. Id. The names of other tests appear in the same column as "D.I. IQ 89" and "101." Id. The ALJ took this information to mean that Claimant achieved IQ scores of 89 and 101. (Tr. 23). Yet when "D.I. IQ" is read in the context of being under the heading "Test – Kind or Type," having an accompanying score to go with it, and the fact that other names of tests appear in the same column as "D.I. IQ 89" and "101," it becomes clear that "D.I. IQ 89" and "101" are names of tests, not the scores Claimant achieved. (Tr. 134).

The ALJ's mis-understanding of this represents a significant flaw in the factual predicate of his analysis. The ALJ frequently cites to these scores in his analysis of Claimant's potential disability under 12.05C. For instance, while the ALJ noted Claimant received a full scale IQ

score of 66 that examiners considered valid, he also noted they failed to reconcile this score with the supposed IQ scores of 89 and 101. (Tr. 23, 291). This was presumably one of the reasons the ALJ discounted the score of 66. (Tr. 25). The ALJ also took Claimant's early IQ scores to mean the national percentile range of the scores. (Tr. 24). Yet the record contains no indication that this is what those numbers represent. The ALJ acknowledged this. (Tr. 25). He said "such figures may well represent the claimant's percentile ranks in the country, or at least among all test takers." Id. The ALJ simply determined 54 and 70 represented national percentile scores in the absence of another explanation. Id. This was error.

The Court believes Claimant meets the requirements for disability under 12.05C. First. Claimant exhibited "significantly subaverage intellectual functioning" before age 22. 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.05C. Claimant received poor IQ scores during his early childhood. (Tr. 134). Claimant was born in 1955, and already by 1968 he had received IQ scores of 54, 70, and 53. Id. His grades also reflect poor intellectual ability. (Tr. 135). Claimant received large amounts of D's and even some F's. Id. Claimant did receive some better grades, but those came primarily in non-intellectually based classes such as drawing, music, and physical education. Id. Claimant also demonstrated "deficits in adaptive functioning initially manifested" before age 22. 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.05C. As mentioned before, Claimant received poor grades throughout school as well as poor scores on standardized tests. (Tr. 134-35). Claimant's psychologists interpreted this as showing "extremely low adaptive skills." (Tr. 291). Claimant meets the third requirement of having "a valid verbal, performance, or full scale IQ of 60 through 70." 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.05C. He received a score of 66 in a test

his psychologists considered valid. (Tr. 289).[7] Finally, Claimant has "a physical or other mental impairment imposing an additional and significant work-related limitation of function." 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.05C. The ALJ found that aside from Claimant's mental impairments, Claimant has the severe physical impairments of "mild degenerative disc disease . . . [and] coronary artery disease." (Tr. 22). The record supports this conclusion. (Tr. 273, 310). Claimant meets all the requirements for disability under 12.05C.

Although a finding that a person meets a medical listing normally results in an automatic award of benefits, the Court is mindful that Claimant's ongoing problems with alcoholism complicate the issue. Alcoholism can under some circumstances serve as the basis for a denial of benefits where a claimant is otherwise disabled. 20 C.F.R. § 416.935. The ALJ considered the issue, as have both the parties in their briefs. The Court will also, therefore, consider the ALJ's treatment of Claimant's alcoholism.

## II.

## The ALJ's Consideration of Claimant's Alcoholism

The Court now considers the ALJ's treatment of Claimant's problems with alcoholism. Claimant contends the record lacks any evidence to show his alcohol problems had any effect on his mental ability. He also argues the ALJ employed the wrong legal technique in considering his alcoholism. Commissioner argues the ALJ did not consider Claimant's alcoholism in his determination of Claimant's disability.

---

[7] While the ALJ did not consider the results of this test valid, his reasons for not doing so were flawed, as noted above. The ALJ noted the psychologists failed to distinguish Claimant's supposedly higher IQ scores from early childhood. (Tr. 23). Yet the Court finds the ALJ misinterpreted this evidence. The ALJ also considered the result invalid because of Claimant's problems with alcoholism. (Tr. 25). This was also error, as will be discussed subsequently.

The Court must first determine whether the ALJ considered Claimant's alcoholism at all in his consideration of Claimant's disability status. The ALJ wrote that he "concluded that the claimant has not, independently of any alcohol use or abuse, evidenced symptoms sufficient to fully satisfy any of the 12.05 listing criteria." (Tr. 24). Claimant argues this shows the ALJ considered Claimant's alcoholism a key factor in his disability determination. Commissioner argues it shows the ALJ considered Claimant not disabled even aside from his alcoholism. Either interpretation is plausible. However, other statements of the ALJ make clear Claimant's reading is correct. The ALJ later writes that "The longitudinal evidence record tends to indicate that the claimant's true level of intellectual functioning is significantly higher and it further appears that ongoing abuse of alcohol could have contributed to the claimant's poor testing efforts." (Tr. 25). This shows the ALJ believed Claimant's alcoholism exaggerated any mental impairments he has.

Having determined the ALJ did consider Claimant's impairments in his decision, the Court will now contemplate whether the ALJ applied the right legal technique. Legal determinations of the ALJ are reviewed de novo. Milburn Colliery Co., 138 F.3d at 528. The Regulations provide for a two step inquiry in determining the significance of alcohol abuse. 20 C.F.R. § 416.935. Under the first step, the ALJ must determine a claimant disabled and also find evidence of alcoholism. 20 C.F.R. § 416.935(a). The second step involves determining whether the claimant would still be "disabled if you stopped using drugs or alcohol." 20 C.F.R. § 416.935(b)(1). If a claimant's limitations aside from alcohol use would still be disabling, the claimant is disabled. 20 C.F.R. § 416.935(b)(2). If the remaining limitations would not be disabling, the claimant is not disabled. Id.

These Regulations make clear the ALJ must find a claimant disabled before he may consider the effects of alcoholism. The Regulations state that the ALJ should only consider alcoholism "If we find that you are disabled." 20 C.F.R. § 416.935(a). Another court within this circuit has held that "an ALJ must first conduct the five-step disability inquiry without considering the impact of alcoholism . . . If the ALJ finds that the claimant is not disabled under the five-step inquiry, then the claimant is not entitled to benefits, and there would be no need to proceed with the [alcoholism] analysis." McGhee v. Barnhart, 366 F. Supp. 2d 379, 389 (W.D. Va. 2005).

The ALJ here failed to comply with the mandates of 20 C.F.R. § 416.935. The ALJ wrote he did not find Claimant to have established disability apart from alcoholism. (Tr. 24). The ALJ found Claimant's alcoholism contributed to an IQ test determined invalid due to Claimant's poor testing efforts. (Tr. 25). He also found alcoholism could have been a factor in Claimant's early childhood IQ tests. Id. Hence, the ALJ considered alcoholism a prominent factor in his analysis of whether Claimant's mental impairments are sufficient to meet 12.05C. This was error. The ALJ should have first determined whether Claimant met the disability requirements of 12.05C, and only if he did determine the impact Claimant's alcoholism had on his impairments. 20 C.F.R. § 416.935(a).

The normal remedy for when an ALJ fails to follow legal rules is remand. After all, it is the duty of the ALJ, not the courts, to make factual findings and "resolve conflicts in the evidence." Smith v. Chater, 99 F.3d 635, 638 (4th Cir. 1996). As long as substantial evidence supports the ALJ's factual findings, the Court must uphold them, even if it disagrees. Smith v. Schweiker, 795 F.2d 343, 345 (4th Cir. 1986). Yet where the record clearly points to only one

conclusion, remand is futile and the Court should decide the case. <u>Alejandro v. Barnhart</u>, 291 F. Supp. 2d 497, 516 (S.D. Tex. 2003) (holding that "The sheer volume of administrative proceedings necessitates that the courts not further burden the SSA with remand of futile claims" and citing cases); <u>Sullivan v. Halter</u>, 135 F. Supp. 2d 985, 988 (S.D. Iowa 2001) (finding that "A remand . . . would only delay the receipt of benefits to which Plaintiff is clearly entitled"); <u>Nalley v. Apfel</u>, 100 F. Supp. 2d 947, 954 (S.D. Iowa 2000) (holding that "a remand in this case would be a 'futile gesture' which would serve only to delay the receipt of benefits").

The Court believes this is a case where remand would be futile since the record contains no indication that Claimant's alcoholism was in any way the source of his mental impairments. Two psychiatric review techniques made no mention of Claimant suffering from substance abuse. (Tr. 189, 293). While psychologists Hinkle and Klein noted Claimant has had problems with alcoholism, they made no finding that this affected his mental ability. (Tr. 287-92). Likewise, although psychologist Morgan considered the tests he conducted on Claimant invalid due to Claimant's perceived poor effort, he did not find Claimant's test results impaired from alcoholism. (Tr. 175-81). In sum, while the evidence establishes Claimant has a history of alcohol dependence, there is no evidence that alcoholism is in some way the source of Claimant's mental impairments.

Therefore, judgment should be entered in favor of Claimant and Commissioner directed to issue an award of benefits. Since the Court makes this finding, it is unnecessary to consider Claimant's arguments regarding the ALJ's credibility assessment of Claimant.

## IV. Recommendation

For the foregoing reasons, I recommend that:

1.      Claimant's Motion for Summary Judgment be GRANTED and Commissioner be directed to issue an award of benefits to Claimant since Claimant meets the disability requirements of listing 12.05C.

2.      Commissioner's Motion for Summary Judgment be DENIED for the same reasons set forth above.

Any party who appears *pro se* and any counsel of record, as applicable, may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection.  A copy of such objections should be submitted to the District Court Judge of Record.  Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.

The Clerk of the Court is directed to provide a copy of this Report and Recommendation to parties who appear *pro se* and all counsel of record, as applicable, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

DATED: January 5, 2007

                                        /s/ James E. Seibert
                                        JAMES E. SEIBERT
                                        UNITED STATES MAGISTRATE JUDGE